IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 77460-3-I |
| | ) | |
| LARRY PAUL WILLIAMS, | ) | DIVISION ONE |
| | ) | |
| Petitioner. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: September 16, 2019 |

ANDRUS, J. — Hana Williams, a teenage girl from Ethiopia, died in her adoptive family's backyard, the victim of physical abuse, inflicted starvation, and hypothermia. A jury convicted Hana's father, Larry Williams,[1] of first degree manslaughter in connection to her death and first degree assault of a child of his adopted son, I.W.[2] We affirmed Larry's convictions and sentence in State v. Larry Paul Williams, No. 71112-1-I (Wash. Ct. App. Dec. 21, 2015) (unpublished),[3] review denied, 185 Wn.2d 1034, 377 P.3d 741 (2016) (hereinafter L. Williams).

In this personal restraint petition, Larry challenges both the legal and evidentiary basis for his convictions as well as the adequacy of his trial and appellate counsel's representation. After a thorough consideration of the trial

---

[1] Larry and his wife, Carri, were charged and tried together. We refer to them by their first names for convenience. We mean no disrespect.
[2] We refer to Hana by her given name but refer to the adopted son by the initials I.W. because he was a minor at the time of trial.
[3] http://www.courts.wa.gov/opinions/pdf/711121.pdf.

record, the parties' briefing, and oral argument, we deny his personal restraint petition.

FACTS

In the early hours of May 12, 2011, Larry received a phone call from his wife, Carri, as he drove home from his job at Boeing. Carri told him that she had found their daughter, Hana, lying face down in the backyard, naked and unconscious. Larry instructed Carri to call 9-1-1, raced home, and helped perform CPR until the medics arrived and transported Hana to Skagit Valley Hospital. Hana was pronounced dead at 1:30 a.m. on May 12, 2011.

A subsequent investigation revealed that Larry and Carri routinely physically and psychologically punished Hana, then a young teen, and I.W., a 9-year-old hearing-impaired boy, both of whom they had adopted from Ethiopia in 2008.

Dr. Daniel Selove, the forensic pathologist who performed Hana's autopsy, noticed that Hana had visible injuries on her pelvis, elbows, knees, and calves; bruises on her knees, eyebrow, and upper pelvis; and multiple impact marks on her thighs and calves. He determined that when she died, Hana suffered from severe malnutrition, with an abnormally thin body and protruding ribs and shoulder blades. Dr. Selove identified Hana's cause of death as hypothermia, with malnutrition and a bacterial infection in her stomach, *h. pylori*,[4] as contributing

---

[4] *Helicobacter pylori* (commonly known as *h. pylori*), is a bacterial infection of the stomach. https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171. Dr. Selove indicated the bacteria was present when Hana died but could not confirm whether Hana was actively experiencing symptoms at the time of her death.

factors. Dr. Rebecca Wiester, a Board-certified physician in child abuse pediatrics with malnutrition and hypothermia expertise, confirmed that Hana died from hypothermia brought on by inflicted starvation.

When Child Protective Services (CPS) interviewed I.W. and the Williamses' seven biological children on May 24, 2011, the children revealed that Larry and Carri had regularly beaten I.W. and Hana, causing scars; had denied them food; had forced them to eat sandwiches soaked in water or eat frozen, uncooked vegetables while sitting outside on the back porch away from the family; and had forced Hana and I.W. to sleep in a locked closet or shower room. CPS removed all of the children from the home in July 2011.

On September 29, 2011, the State charged Larry and Carri with homicide by abuse under RCW 9A.32.055, and the alternative crime of first degree manslaughter under RCW 9A.32.060, for the death of Hana, and first degree assault of a child under RCW 9A.36.120 for their mistreatment of I.W. On September 9, 2013, following a seven week trial, the jury found Larry guilty of manslaughter and assault.[5] The jury also found several aggravating factors, including that Larry's conduct manifested deliberate cruelty, that Larry knew or should have known Hana was particularly vulnerable or incapable of resistance, that the crime was an "aggravated domestic violence offense," that Larry used his position of trust to facilitate the commission of the crime, and that Larry's crime involved a destructive and foreseeable impact on persons other than Hana.

---

[5] The jury did not reach a verdict on Larry's homicide by abuse charge. But the same jury found Carri guilty of all three charges.

- 3 -

On October 29, 2013, the trial court imposed consecutive sentences of 210 months for the first degree manslaughter conviction and 123 months for the first degree child assault conviction. We affirmed Larry's convictions and sentence on direct appeal. L. Williams, No. 71112-1-I, slip op. at 2.

In this personal restraint petition, Larry challenges: (1) the sufficiency of the evidence of manslaughter; (2) the admissibility of evidence related to "torture;" (3) the admissibility of expert testimony that I.W. suffered from post-traumatic stress disorder (PTSD); (4) the admissibility of expert testimony that Hana and I.W. had been "tortured" by their parents; (5) the trial court's purported decision to permit the State's experts to define "torture;" (6) the admissibility of testimony relating to a book on child discipline found in the Williams home; and (7) the assistance of counsel he received at trial and (8) on direct appeal.

## ANALYSIS

### Standard of Review

An appellate court may grant relief to a petitioner who is under restraint and who can demonstrate his restraint is unlawful. RAP 16.4; In re Pers. Restraint of Cook, 114 Wn.2d 802, 805, 792 P.2d 506 (1990). Restraint is unlawful when a conviction is obtained in violation of the United States Constitution or the laws of the state of Washington. RAP 16.4(c)(2).

Relief by way of a collateral challenge to a conviction is extraordinary and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). A petitioner has the burden of demonstrating error and, if the error is

constitutional, actual and substantial prejudice. In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 821, 408 P.3d 675 (2018). If the error is not constitutional, the petitioner must show that the error represents a "fundamental defect . . . that inherently resulted in a complete miscarriage of justice." Id. (quoting In re Pers. Restraint of Finstad, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)). Furthermore, a petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require the issue to be reexamined. In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 473, 965 P.2d 593 (1998).

### Claim 1: Sufficiency of the Evidence of Manslaughter

Larry contends that there was insufficient evidence to support his conviction for first degree manslaughter. Larry acknowledges that he raised a sufficiency challenge on direct appeal. He argues, however, that the issues he raises here are different. First, he argues that Washington's accomplice liability statute does not apply to unintentional crimes like manslaughter. Second, he contends that the State failed to present evidence that he actually knew that Carri was acting recklessly or that he intended to promote or facilitate such recklessness. Finally, Larry maintains that there was no evidence that Carri knew of, or disregarded, a substantial risk of death by hypothermia.

(a) Accomplice Liability for Manslaughter

Larry first argues he cannot be an accomplice to the unintentional crime of manslaughter. The accomplice statute provides:

> A person is an accomplice of another person in the commission of a crime if: (a) With knowledge that it will promote or facilitate the commission of the crime, he or she: (i) Solicits, commands,

encourages, or requests such other person to commit it; or (ii) Aids
or agrees to aid such other person in planning or committing it . . .

RCW 9A.08.020(3)(a). A person is guilty of first degree manslaughter when "He
or she *recklessly* causes the death of another person." RCW 9A.32.060 (emphasis
added). "A person is reckless or acts recklessly when he or she knows of and
disregards a substantial risk that a wrongful act may occur and his or her disregard
of such substantial risk is a gross deviation from conduct that a reasonable person
would exercise in the same situation." RCW 9A.08.010(1)(c). For manslaughter,
the "wrongful act" is homicide. State v. Gamble, 154 Wn.2d 457, 467, 114 P.3d
646 (2005).

Our Supreme Court recently considered a similar argument in In re Personal
Restraint of Sandoval. In that case, the defendant was convicted of, among other
crimes, first degree murder by extreme indifference[6] as an accomplice. 189 Wn.2d
at 815. The *mens rea* for murder by extreme indifference is "to know of and
disregard the fact that his conduct presents a grave risk of death to others." State
v. Barstad, 93 Wn. App. 553, 568, 970 P.2d 324 (1999); 11 WASHINGTON PRACTICE:
WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.06, at 395 (4th ed. 2016)
(WPIC). It is essentially an "aggravated form of recklessness." State v. Yarbrough,
151 Wn. App. 66, 82, 210 P.3d 1029 (2009).

Sandoval argued that accomplice liability for murder by extreme
indifference is not a cognizable offense. Sandoval, 189 Wn.2d at 825. The Court
rejected this argument, citing with approval to 2 Wayne R. LaFave, SUBSTANTIVE

---

[6] A person is guilty of first degree murder when "[u]nder circumstances manifesting an
extreme indifference to human life, he or she engages in conduct which creates a grave risk of
death to any person, and thereby causes the death of a person." RCW 9A.32.030.

CRIMINAL LAW §13.2(e) at 353 (2d ed. 2003) for the proposition that "giving assistance or encouragement to one it is known will thereby engage in conduct dangerous to life should suffice for accomplice liability as to crimes defined in terms of recklessness or negligence." Id. at 826. It held that Sandoval could be held liable as an accomplice "even though the crime is not a specific intent crime." Id.

Sandoval is dispositive of Larry's legal argument. As long as the State presented evidence sufficient to establish that Larry knew he was facilitating Carri's conduct and that conduct placed Hana's life at risk, accomplice liability is properly available.

(b) Sufficiency of Evidence of Larry's Knowledge He was Facilitating a Homicide

Next, Larry argues there was insufficient evidence to prove he had actual knowledge that he was promoting or facilitating the crime of manslaughter. But this argument was raised on direct appeal and rejected by this court. L. Williams, No. 71112-1-I, slip op. at 8-10. We see no reason to revisit this evidentiary challenge when it was raised on direct appeal.

We also reject Larry's argument that he had no actual knowledge of Carri's conduct on the day Hana died. This argument was also raised and rejected by this court in Larry's direct appeal. L. Williams, No. 71112-1-I, slip op. at 11 ("Contrary to Larry's argument, the '[o]n or about May 12, 2011' charging period for the manslaughter charge does not limit the charge only to events when Larry was not home on May 11 and 12, 2011. . . . '[W]here time is not a material element of the charged crime, the language 'on or about' is sufficient to admit proof of the act at any time within the statute of limitations, so long as there is no defense of alibi'").

There is ample evidence in this record to establish Larry actually knew what Carri was doing to Hana. "Knowledge" is statutorily defined in RCW 9A.08.010(1)(b) as:

> A person knows or acts knowingly or with knowledge when: (i) he or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or (ii) he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.

A person can be found to have knowledge of an act without knowing that the act is an element of a crime. See 11 WASHINGTON PRACTICE: WPIC 10.02 at 223 (4th ed. 2016), comment ("the defendant must have knowledge of the facts, circumstances, or results that constitute a crime, rather than knowledge that the facts, circumstances, and results are a crime"). See also State v. Dreewes, 192 Wn.2d 812, 825, 432 P.3d 795 (2019) (Washington's culpability statute provides that a person has "actual knowledge" when he or she has information which would lead a reasonable person in the same situation to believe he was promoting or facilitating the crime eventually charged).

The State presented evidence from which a jury could conclude that Larry had information from which a reasonable person in his situation would have known that Carri was starving and physically abusing Hana to such a degree that she was placing Hana at significant risk of death. I.W., who was 12 at the time of trial, and six of the Williamses' biological children,[7] consistently described their parents'

---

[7] Four of Larry's biological sons all have the same initials—J.W. To avoid confusion, we refer to the two eldest sons by their first names, Joshua and Jacob, because they were both over the age of 18 at the time of trial. We refer to his other two sons as his third and fourth biological sons. Larry's two daughters who testified will be referred to as C.W., who was 14 at the time of trial, and S.W., who was 13 at the time of trial.

treatment of Hana. Jacob testified that both parents had an equal say in whether a child was "rebelling." Their third biological son testified that both parents were equal disciplinarians, that they always discussed and agreed on their household rules, and that they jointly determined what penalties to impose. Moreover, Carri testified that she and Larry discussed how they intended to discipline Hana and always agreed on it. A reasonable jury could conclude that Larry was intimately involved in deciding when and how to punish Hana.

Larry admitted that he began physically punishing Hana in the summer of 2010. Larry and Carri both beat Hana with a wooden stick, and spanked Hana with multiple "switches,"[8] in addition to a belt. Larry hit Hana on the top of her head, and on the bottoms of her feet, treatment her brother, I.W., also experienced and described as "very painful." Larry admitted his physical punishments were intended to inflict pain and discomfort.

The Williams children and their parents also provided consistent descriptions of Hana's quotidian living conditions. When Hana first arrived from Ethiopia, she slept in a bedroom with her sisters. When Larry and Carri caught Hana stealing food, they forced her to sleep outside in a barn without electricity. Both parents discussed and agreed on this punishment. For a two-week period in the fall of 2010, when Larry and Carri caught Hana stealing food a second time, Larry locked Hana in a shower room at night without access to a toilet. Both parents agreed to this mode of punishment as well.

---

[8] The Williamses used a plastic plumbing tube and glue stick to strike the children, which the children referred to as "switches."

- 9 -

For the last six months of Hana's life, Larry and Carri agreed that Hana should be locked in a small closet every night.[9] To facilitate this, Larry installed a lock on the outside of the closet door. The closet light switch was similarly located on the outside of the closet. Thus, Hana remained in the closet until released by her parents with no ability to control the closet lighting. Larry admitted to escorting Hana to, and locking her in, the closet. He also admitted to unlocking the closet door to deliver meals to her.

Larry further admitted that he knew that Carri forced Hana to stay in the closet during the daytime if she refused to follow Carri's instructions to go outside. Hana spent most of the last months of her life outside the house or locked in the closet, sometimes for up to 24 hours at a time. Given the testimony regarding the amount of consultation the parents engaged in when deciding punishments, the jury could reasonably conclude Larry was aware of this as well.

Larry and Carri also agreed to use food deprivation as a form of punishment. Hana and I.W. often missed meals as punishment, with Hana sometimes being denied food for two consecutive days. Moreover, when Hana and I.W. received meals, they were not fed the same food as the other Williams children. Instead, the lunch sandwiches that Hana and I.W. received had been soaked in water by either Larry, Carri, or one of the other children at their parents' direction. Carri testified that the children were fed these "wet sandwiches" because Hana and I.W. refused to cooperate at the meal table. Dinnertime was no different. Carri usually

---

[9] The closet measured 2 feet by 4 feet, 3 inches. At the time of her death, Hana was 5 feet tall.

- 10 -

served Hana and I.W. cold leftovers topped with un-defrosted frozen vegetables. Larry admitted he was aware Carri was feeding still-frozen food to Hana and I.W.

Larry and Carri also required Hana and I.W. to eat separately from the rest of the family. Both parents forced Hana and I.W. to eat on the floor, in another room, or outside, when the rest of the family ate at the dining room table. In the last few months of Hana's life, Carri and Larry both forced Hana and I.W. to eat their meals outside for what Carri described as "meal time oppositionality." Larry, who prepared breakfast for all of his children before leaving for work each day, testified that he was aware that Hana ate breakfast outside more often than not in the last six months of her life for being "disagreeable and uncooperative."

Larry also admitted that he was aware that Hana was losing weight before her death. Hana went from a weight of 108 pounds and a base metabolic index (BMI) of 23.46 in April 2009, to 78 pounds, and a BMI of less than 16, which signified severe malnutrition, on the day of her death in May 2011. A jury could reasonably conclude that Hana's significant weight loss was due to the mealtime tactics used by both Larry and Carri.

Larry knew that Hana was forced outdoors and to do exercises and "boot camp" at Carri's instruction. "Boot camp" involved performing extra chores, usually outdoors, and sometimes involved stacking and restacking the same pile of rocks. Larry was aware that there were times when Hana would not come back indoors once forced outside.

The children testified that their daily routine was similar each day. May 11, 2011, began as a typical day for the Williamses, with Larry managing the children

before departing for work, as he usually did. Larry, with C.W. and S.W.'s assistance, prepared breakfast around 10:00 a.m. Given that Larry admitted that Hana ate breakfast outside "more often than not," she likely ate her breakfast outside that morning.

After breakfast, the children went outside to play "Capture the Flag." Hana, who was wearing a t-shirt and sweat pants, was outside but did not participate. Larry left for work around noon.

The evidence at trial established that Hana remained outside for hours that day. Carri regularly escorted Hana to and from the outhouse throughout the day, and on the day of her death, Carri did so on three separate occasions, around 3 p.m., again at 6 p.m., and finally at 8:30 p.m. When Hana began to "throw[] herself down" onto the ground, hitting her forehead repeatedly, Carri left Hana outside in the dark. Instead of tending to Hana's wounds or bringing her inside, Carri instructed three of her sons to go outside, one after the other, to hit Hana with the plastic plumbing tube until she started doing exercises to keep warm. Several hours later, Carri testified that she saw Hana sitting "buck naked" from the waist down. Hana remained outside, bloody, wet, cold, and naked, for at least two more hours.

Larry testified that he typically called home during his breaks at work. And Carri generally advised Larry what was going on at home when he called. Larry and Carri exchanged at least two phone calls in the late hours of May 11 and the early hours of May 12, 2011. Around midnight, Larry called Carri to let her know that his vanpool had dropped him off at the park and ride and that he was on his

- 12 -

way home. When Carri told Larry about Hana's behavior, Jacob overheard them discussing whether Hana was really falling down on purpose. But Larry testified he was not surprised by Carri's description of Hana's behavior, from which a jury could infer that it had happened previously.

Carri called Larry a second time about ten minutes later. This time, Carri alerted Larry that she had found Hana, lying face-down and unconscious, in the backyard and that Hana was cold to the touch. She also told him that neither she nor Joshua could detect Hana's pulse. Larry arrived home shortly thereafter and was there when medics arrived and transported Hana to Skagit Valley Hospital.

Dr. Janette Tomlinson pronounced Hana dead at 1:30 a.m. on May 12, 2011. Dr. Tomlinson noted contusions on Hana's forehead, bruises and abrasions on her hips, knees, and shins, and red streaks on her thighs. Carri told Dr. Tomlinson that Hana had been "face planting" outside that night. Dr. Tomlinson found this version of events odd because it was inconsistent with the normal human reflexive response to a fall. She testified that "if you try to fall down and hit your nose, if you are standing on flat ground and you just try to fall to the ground, your hands usually protect you from falling."

The State's experts testified that Hana's behavior before and on May 11, 2011, can be explained by the fact that she was so severely malnourished. Dr. Wiester testified that starvation causes distress and anxiety in a child, leading the child to steal food, exhibit abnormal behaviors around food, and engage in defiant behaviors in general. Dr. Frances Chalmers, a pediatric medical consultant for the State, testified that when a body lacks adequate fuel in the form of calories,

and it starts using stored body tissue, the result can be irritability, behavioral changes, fatigue, and serious cardiac arrhythmia.

Dr. Wiester testified that using food deprivation as punishment and isolating Hana during mealtimes, either by making her eat outside or by making her eat in the closet, were actions consistent with the "intentional infliction of starvation." She testified:

> [C]hildren who have inflicted starvation begin with having restricted food or having bad food or no food or food different from the rest of the family or bread and water or something like that, and then the pattern of the behavior which is very commonly seen is that kids start to steal food, they start to lie about food, they start to hoard food, they start to take other people's food, and then the problem becomes that [it] is seen as bad behavior which then sort of spirals into more disciplinary approaches and more restriction and more treatment for bad behavior and being disagreeable and disobedient. So then there's even more restriction and then it sort of becomes a self-fulfilling prophecy . . . .

Moreover, Dr. Chalmers and Dr. Wiester testified that a child as emaciated as Hana, as a result of this "inflicted starvation," would be more susceptible to hypothermia because they lack sufficient insulating fat under the skin to keep the body warm in a cool environment. And Dr. Wiester noted that those suffering from hypothermia exhibit erratic physical movements, such as stumbling, difficulty walking, and irrational behavior from an altered mental status. Dr. Selove noted that hypothermia victims often have a false sensation that they are warm and engage in "paradoxical undressing," meaning they remove their clothing even though one would expect them not to do so. Ultimately, an individual suffering from severe hypothermia will lapse into a coma.

Furthermore, the jury was instructed that "[a] parent of a dependent child has a duty to provide to the child the basic necessities of life. The parent also has the duty to provide medical care." Neither Carri nor Larry ever sought advice from any medical or behavioral professional for what they considered to be Hana's "rebelliousness." Neither saw any cause for concern for Hana's health. Larry told the police he thought Hana was the healthiest of the family. The family's doctor, Harold Clark, however, testified that he last saw Hana in April 2009, over two years before her death.

Larry argues that the evidence did not establish that he knew what Carri was doing until they spoke around midnight, after Hana had collapsed. But there was substantial evidence from which the jury could conclude that Carri's actions on the day of Hana's death were no different than her actions on any other day in Hana's life. And there is significant evidence that Larry knew how Carri was abusing Hana on a daily basis because he was engaging in the same acts of abuse when he was home. The jury was not obligated to accept either Larry's or Carri's testimony that they did not realize that their food deprivation, physical discipline, and emotional abuse would lead to Hana's death. Thus, a reasonable jury could conclude from the evidence that Larry knew that Carri was starving Hana, supported and encouraged her conduct, and directly participated himself in the conduct that ultimately led Hana to succumb to hypothermia.

Our conclusion is bolstered by the jury's specific findings regarding Larry's conduct in connection with his manslaughter conviction. The jury found several aggravating factors: deliberate cruelty, victim vulnerability, abuse of trust, and a

destructive and foreseeable impact on persons other than the victim. L. Williams, No. 71112-1-I, slip op. at 18. This court held that these factors were not based on Carri's conduct but had to be based on Larry's own misconduct and knowledge. Id. at 19. "The plain language of the special verdict form ties Larry's own conduct directly to the aggravating factors." Id. This court concluded that Larry's manslaughter conviction was based on his own conduct or "his knowledge of the principal's conduct." Id.

The evidence was sufficient for the jurors to conclude that Larry had actual knowledge that Carri was engaging in extremely reckless conduct on the day of Hana's death and had actual knowledge that he was promoting or facilitating this recklessness.

(c) Evidence of Carri's Knowledge of and Disregard for Substantial Risk of Death

Larry also contends that there is insufficient evidence to establish that Carri knew of and disregarded a substantial risk of death of hypothermia. We disagree.

Due process requires the State to prove each element of the crime beyond a reasonable doubt. State v. Mau, 178 Wn.2d 308, 312, 308 P.3d 629 (2013). When a party challenges the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the prosecution. Id. The evidence is sufficient when any rational trier of fact could have found the essential elements beyond a reasonable doubt. State v. Baeza, 100 Wn.2d 487, 490, 670 P.2d 646 (1983).

On the day of Hana's death, Carri removed Hana from a locked closet, forced her outside, probably forced her to "walk the line" or do "boot camp,"

physically beat her, and despite Hana's erratic behavior, ordered her three eldest sons to beat her and force her to do jumping jacks and squats. Moreover, Carri offered cold food to Hana for dinner but then promptly took it away when Hana lacked sufficient body coordination to actually get the fork to her mouth. Carri later saw Hana fall to the ground and sustain multiple injuries, including a large, visible "knot" on Hana's forehead, signaling significant trauma to her head. Yet Carri did nothing to stop what may have been intentionally self-harming behavior or to determine what may have been the cause of her erratic physical movements or her inability to eat. And even after learning that Hana was naked, bloody, possibly concussed, cold, and wet, Carri left Hana sitting on the back porch for hours. Finally, when Carri discovered Hana, unconscious and without a detectable pulse, she called Larry instead of calling 9-1-1. The jury could reasonably find that Carri passively stood by while Hana slipped into unconsciousness from starvation and exposure because Carri simply did not care whether Hana lived or died. We therefore reject Larry's Claim 1.

### Claims 2, 4 and 5: Definition of and Evidence Relating to "Torture"

Larry makes three separate arguments related to evidence that I.W. was a victim of "torture." First, he contends that the trial court erroneously admitted evidence of I.W.'s mental and emotional abuse, arguing that the term "torture" used in the child abuse statute applies only to physical, and not to psychological, harm. Second, he argues that the trial court erroneously permitted the State's experts to opine that I.W. had been tortured. Finally, he maintains that the trial court erred in

failing to provide the jury with a definition of torture, in violation of article IV, section 16 of the Washington State Constitution. We reject all three arguments.

(a) Definition of "Torture"

RCW 9A.36.120 provides:

(1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:

(a) Commits the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child; or

(b) Intentionally assaults the child and either:

(i) Recklessly inflicts great bodily harm; or

(ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) *causing the child physical pain or agony that is equivalent to that produced by torture.*

Larry and Carri moved to exclude evidence that their disciplinary techniques caused mental anguish without physical pain, arguing that the undefined term "torture" was ambiguous and should be limited to the infliction of physical pain. The trial court rejected this argument:

[W]hat the courts are requiring us to do is use common sense and the common sense definition of the word torture. I think all we have to do is think about the treatment of POWs and the affect [sic] of isolation and solitary confinement and darkness on someone. It doesn't have to involve physical harm or pain at all.

- 18 -

As a result, the State presented evidence of the range of abusive discipline that Larry and Carri inflicted on I.W.,[10] including techniques that did not involve the infliction of physical pain, such as spraying I.W. with cold water with the outdoor hose or using cold shower water when he wet his pants, punishing I.W. by withholding his food or by feeding him unpalatable food, forcing I.W. to eat meals outside away from the family dining table, locking I.W. in a shower room to sleep when he wet the bed, and isolating I.W. from the rest of the family during holiday and birthday celebrations.

The State also presented evidence that Larry physically abused I.W. I.W. testified that Larry hit him all over his body with the switches as punishment and that these punishments increased over time. He testified that Larry and Carri both hit the bottoms of his feet, causing him pain when he tried to get up and walk. Jacob corroborated I.W.'s testimony. I.W. also testified that Larry once hit him on the head, causing him to bleed, and instead of tending to him, he pushed I.W. out the front door and threw him a towel to wipe up the blood. I.W. also showed his scars to the jury, and he testified that he received them from beatings by Larry and Carri. And Heidi Kennedy, a CPS investigator, testified about the physical scars she saw and photographed on I.W.'s body after CPS removed I.W. from the Williams home.

Larry contends that the trial court erred in interpreting "torture" expansively to include actions causing mental anguish. The child assault statute requires proof

---

[10] Because the assault charge was limited to conduct against I.W. and because Larry was not convicted of homicide by abuse, we do not address the Williamses' assaultive conduct toward Hana, which was similar in nature, if not identical, to that against her younger brother.

of "a pattern or practice . . . causing the child physical pain or agony that is equivalent to that produced by torture." RCW 9A.36.120(1)(b)(ii). Larry argues that the adjective "physical" modifies both "pain" and "agony" which in turn limits the meaning of the phrase "equivalent to that produced by torture." We disagree with this interpretation of RCW 9A.36.120(1)(b)(ii).

We review a trial court's interpretation of a statute de novo. State v. Bunker, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010). The purpose of statutory interpretation is to give effect to the intent of the legislature. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). To derive legislative intent, we look to the plain language of the statute, considering the text of the provision, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). If the statute is unambiguous, then the plain meaning governs. State v. Bostrom, 127 Wn.2d 580, 586-87, 902 P.2d 157 (1995).

If, however, more than one interpretation of the plain language is reasonable, we then rely on rules of statutory construction, legislative history, and relevant case law to discern legislative intent. State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010); State v. Barbee, 187 Wn.2d 375, 383, 386 P.3d 729 (2017). Only if the statute remains ambiguous after we apply the traditional canons of construction do we apply the rule of lenity and resolve any ambiguity in a criminal statute in favor of the defendant. In re Pers. Restraint of Hopkins, 137 Wn.2d 897, 901, 976 P.2d 616 (1999); ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 197 (2012).

When discerning the plain language of a statute, we employ traditional rules of grammar. Bunker, 169 Wn.2d at 578. One such rule is the series-qualifier canon, in which an adjective at the beginning of a conjunctive phrase applies equally to each object within that phrase. SCALIA & GARNER, supra, at 147. If we were to apply this syntactic canon, the adjective "physical" would modify both "pain" and "agony." However, "[p]erhaps more than most of the other canons, this one is highly sensitive to context." Id. at 150. The contextual "surplusage" canon provides that when possible, we must give every word or phrase effect and not reach an interpretation that renders that word or phrase superfluous. State v. Dennis, 191 Wn.2d 169, 173, 421 P.3d 944 (2018); SCALIA & GARNER, supra, at 174. If we were to construe RCW 9A.36.120(1)(b)(ii)(B) to mean "physical pain or physical agony," that latter phrase would become redundant of the former. There would be no reason to use the word "agony" if the Legislature intended to limit the element of the crime in this fashion.

When a statutory term is undefined, we must give the words of a statute their ordinary meaning and may look to a dictionary for such meaning. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). "Agony" has a commonly understood meaning broader than physical pain: "intense pain of mind or spirit: extreme distress: anguish." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 43 (2002). "Torture" is also not statutorily defined, but in State v. Peterson, 133 Wn.2d 885, 890-91, 948 P.2d 381 (1997), our Supreme Court cited, with approval, to the dictionary definition in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2414 (1969):

> The infliction of intense pain (as from burning, crushing, wounding) to punish or coerce someone . . . *anguish of body or mind*: excruciating agony: extremity of suffering . . . an extreme annoyance or severe irritation: an intense strain: something pernicious or baneful . . . extreme strain or abuse . . . .

Given the context in which the words "physical pain or agony" appear, in connection with the phrase "equivalent to that produced by torture," and the ordinary definitions of agony and torture, we conclude the statute covers conduct broader than the infliction of physical pain.

Because the trial court's interpretation was correct, the trial court did not err in concluding that evidence of psychological abuse was relevant to the charge of first degree assault of a child. Larry contends the trial court failed to conduct an ER 403 analysis of any of the challenged evidence.[11] But Larry did not raise this non-constitutional issue on direct appeal and thus must establish by a preponderance of evidence that there was a fundamental defect resulting in a complete miscarriage of justice. In re Pers. Restraint of Yates, 177 Wn.2d 1, 17-18, 296 P.3d 872 (2013). It is difficult for a petitioner to meet this burden for evidentiary errors. See Pirtle, 136 Wn.2d at 489 ("[E]ven if there was an evidentiary error with [] opinion testimony, such an error does not constitute a 'fundamental defect' amounting to a 'miscarriage of justice'.") Given the highly probative nature of Larry's and Carri's pattern of abuse of I.W. under RCW

---

[11] Carri raised an ER 403 challenge in her motion to exclude the evidence. Larry joined in that motion. From the transcript of the trial, however, it appears that the parties focused their argument on the relevance of the evidence, not its prejudicial effect. The only reference to ER 403 arose in the context of an argument to exclude evidence that Larry touched I.W.'s penis, evidence the trial court excluded as unfairly prejudicial.

9A.36.120, Larry has not demonstrated that the admission of this evidence resulted in a complete miscarriage of justice.

(b) Expert Testimony Regarding Torture

Larry next argues that the trial court erred in permitting the State's experts to testify that Larry tortured I.W. The State presented two expert witnesses on the topic of torture: John Hutson, a former Navy Judge Advocate General (JAG) and former dean of Franklin Pierce School of Law at the University of New Hampshire, and Dr. Katherine Porterfield, a clinical psychologist at the Bellevue/NYU Program for Survivors of Torture.

## John Hutson

Hutson had expertise in the international norms relating to torture, specifically those set out in the Geneva Conventions,[12] the United Nations Convention against Torture,[13] the War Crimes Act,[14] and the Army Field Manual.[15]

---

[12] See Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (Geneva Convention No. I), Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea (Geneva Convention No. II), Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War (Geneva Convention No. III), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva Convention No. IV), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. The Geneva Conventions have been signed and ratified by every country in the world, including the United States, and thus have the force of law in the United States under article VI, cl. 2 of the United States Constitution. United States v. Hamidullin, 888 F.3d 62, 66 (4th Cir. 2018).

[13] United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85. President Reagan signed the Convention on April 18, 1988. Zheng v. Ashcroft, 332 F.3d 1186, 1192 (9th Cir. 2003). The Senate adopted its resolution of advice and consent to ratification on October 27, 1990. 136 Cong. Rec. 36,198 (1990). On October 21, 1994, President Clinton deposited the instrument of ratification with the United Nations, and the Convention Against Torture was entered into force for the United States thirty days later. Zheng, 332 F.3d at 1193.

[14] 18 U.S.C. § 2441.

[15] See Dep't of the Army Field Manual: The Law of Land Warfare, FM 27-10 (1956), https://usacac.army.mil/sites/default/files/misc/doctrine/CDG/cdg_resources/manuals/fm/fm27_10.pdf.

He testified that the Geneva Conventions set the "gold standard" in defining "those things that are generally considered to be torture."

Defense counsel objected to Hutson's testimony on several grounds, challenging Hutson's qualifications, the relevance of his testimony, and the appropriateness of any testimony defining torture. The trial court ruled:

> [W]ith respect to this witness's expert testimony on the topic of torture, I wanted to put on the record the basis for the ruling that he can testify. As I understand the arguments from [c]ounsel, the first is that the witness'[s] expression of an opinion on whether or not this conduct constituted torture would invade the province of the jury, and that it's for the jury to decide whether or not this is torture, and therefore, no expert should be allowed to testify on that subject.
>
> I've considered that argument, and I think that under these circumstances the testimony is appropriate. Experts often testify on topics that are assigned for decision by the jury. Causation is an example that probably appears in at least 75 percent of the cases we deal with, and experts always testify or quite often testify on the issue of causation even though the jury is ultimately assigned to determine whether or not there is a causal connection.
>
> It seems to me that this is somewhat analogous. It's not the ultimate question before the jury; it is one of those preliminary determinations that's part of the analysis, and it seems to me that it's appropriate to have an expert testify at that level of analysis. It doesn't go to the ultimate question of whether or not the defendants are guilty of the charges, but merely whether certain conduct constitutes torture. So I don't think it invades the province of the jury inappropriately.
>
> The next argument, as I understand it, is that the expert testimony is unnecessary because the analysis of whether something is torture or not is within the ken of an average lay juror. Certainly some conduct would fall in that category – thumb screws, the rack, burning matches under the fingernails, that kind of thing. But that's not what we have here.
>
> What we have here is a more subtle combination of things involving children from another country in an environment of family, and that's probably not the sort of thing that's going to be within the understanding of an ordinary juror, at least not completely. Most people's exposure to torture is in fiction or movies, maybe reading

- 24 -

the newspaper, but certainly not any kind of real understanding or exposure to the topic at all. And so I think it is testimony that can be helpful to the jury in analyzing this factor.

The last issue is – challenge, as I understand it, is to the qualifications of this expert, specifically. And I've taken a look at that very carefully. I looked at his curriculum vitae yesterday. I read his report this morning. I listened to his testimony yesterday. It appears that this individual has been studying this subject for the last twelve years, and although he doesn't have a degree in the topic, has not done any research on the topic, it appears that he has been involved in analyzing and exposing himself to the topic for the last twelve years, and had some exposure before that as part of his work in the military and as a military attorney and dean of a law school.

So I think he does have the qualifications to assist the jury in analyzing this particular aspect of the case, and so for those reasons I allow his testimony.

Hutson testified that the international standard against torture prohibits "cruel, inhumane, and degrading treatment," including humiliation and violations of personal dignity. He stated that many people have the misconception that "torture" is exclusively physical, and that while beatings and pain may be torture, "some of the most insidious and the most painful torture is sensory deprivation, isolation . . . threats of torture . . . [and] watching somebody else for whom you care be tortured . . . ." He testified that torture includes both mental and psychological anguish. Hutson explained that the factors to consider when deciding whether conduct is torture include the duration and frequency of the conduct, the combination of various types of mistreatment, the physical and emotional well-being of the victim, and the motivation of the alleged perpetrator.

Hutson testified that "classic examples" of torture include beating a victim on the bottom of the feet, requiring them to take cold outdoor showers, confining them in small spaces, such as a shower room, denying them the ability to control

- 25 -

lighting conditions in the place of confinement, serving inedible or unpalatable food, and requiring them to eat in isolation.

Hutson discussed his understanding of the conditions I.W. experienced in the Williams home and testified that, in his opinion, the Williamses' beatings and isolation of I.W. were extreme. At the end of his direct testimony, Hutson was asked:

> Q: Do you have an opinion whether Hana Williams and [I.W.], through the course of time that they were living at the Williams house, were subjected to torture, and if you do have such an opinion, what is . . . your opinion?
>
> A: . . . Yes, I do have an opinion with regard to each of them. And in my judgment, it's not a close case. They both were, unquestionably, tortured.

### Dr. Porterfield

Dr. Porterfield had expertise in the treatment of victims of war or refugee trauma and torture. As director of her clinic, Dr. Porterfield established intake criteria, using a definition of torture adopted by the United Nations, to assess individuals seeking treatment. She also created treatment plans, provided therapy, and supervised the therapies provided by others on her staff, for torture victims.

When Dr. Porterfield was asked to define "torture," defense counsel objected. The trial court sustained the objection, permitting Dr. Porterfield to describe the criteria she used when deciding whether to admit someone into her program and to opine whether Larry's and Carri's actions met these criteria. The trial court disallowed her from defining torture "because it's going to be confusing to the jury how many definitions are out there and who's using what."

- 26 -

Consistent with the trial court's ruling, Dr. Porterfield testified that the criteria she used in assessing torture victims included evaluating for PTSD or depression and comparing the patients' reports of what had happened to them against the standards laid out in the Tokyo Declaration[16] and the United Nations Convention Against Torture. These criteria include determining whether the person experienced acts involving severe psychological or physical pain or suffering.

Dr. Porterfield testified that in this case, she was asked to determine whether the treatment of I.W. was "consistent with torture," as that term is defined by medical professionals, and whether the kind of treatment I.W. and Hana experienced would cause severe suffering, pain, and anguish.

Dr. Porterfield then testified that after reviewing witness statements and the testimony of the Williams children, interviewing therapists and social workers, and interviewing and evaluating I.W. in person,[17] she concluded that the treatment of I.W. was consistent with physical and mental "systematic" torture. Dr. Porterfield pointed to two overarching aspects of I.W.'s treatment to support this conclusion— first, the systemic, planned, and deliberate nature of the abusive and coercive treatment; and second, the combination of psychological and physical abuse that would have been particularly damaging to children.

---

[16] World Medical Association Declaration of Tokyo – Guidelines for Medical Doctors Concerning Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment, adopted by the 29th World Medical Assembly, Tokyo, Japan, October 1975, available at http://www.cirp.org/library/ethics/tokyo/.

[17] Before Dr. Porterfield offered any specific opinions, the court instructed the jury that Dr. Porterfield's recounting of events in the Williams home could be considered only in deciding what weight the jury should give to her opinions and that the jury could not consider the recounting of these events as true or assume from her testimony that the events described actually occurred.

As to the systemic nature of the treatment, Dr. Porterfield noted that Larry's and Carri's treatment of I.W. was not impulsive but explicitly planned to "curb . . . rebelliousness." She discussed the severity and frequency of the punishment, the duration of the most severe treatment, and the planned use of specific items used to hit the children as indications of a systemic pattern of abuse.

As to the combined impact of psychological punishment and physical discipline, Dr. Porterfield testified that the withholding of food and isolation during meal times was a type of isolation that would be "quite distressing and damaging to a child." She testified that restricting food repeatedly or altering food to make it unpalatable or unappealing while the rest of the family could be seen eating a regular meal was consistent with a kind of psychological and physical treatment designed to make a person feel humiliated. Dr. Porterfield further testified that I.W. suffered from both psychological humiliation and degradation and physical discomfort when Larry and Carri hosed him off outside with cold water when he wet his pants.

Dr. Porterfield described the isolation of I.W. when he was locked in the shower room overnight after wetting the bed or separated from the family for stealing food or lying, and the physical mistreatment of I.W. when he was doused with cold water as punishment for wetting himself, and beaten repeatedly. I.W. described his parents' handling of his toileting problems as particularly humiliating and degrading because his siblings were instructed to check the inside of his pants to determine if he had wet himself. Dr. Porterfield further testified that when she

spoke to I.W. directly about his experiences, he became very agitated and distressed.

Dr. Porterfield concluded that the combination of isolation, physical abuse, and humiliating treatment I.W. experienced was consistent with torture under the criteria she used to evaluate patients.

Larry argues that Hutson's and Dr. Porterfield's testimony constituted an impermissible opinion of guilt. While whether to admit expert opinions, and to what extent, is within the sound discretion of the trial court, State v. Swan, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), an expert witness may not testify as to their personal belief of a defendant's guilt, the intent of the accused, or the veracity of witnesses, whether by direct statement or inference, State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987); State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008).

To determine whether a statement constitutes an impermissible opinion on guilt, we consider (1) the type of witness involved; (2) the specific nature of the testimony; (3) the specific nature of the charges; (4) the type of defense; and (5) the other evidence before the jury. State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Courts need not exclude expert testimony just because it covers an ultimate issue that the jury must decide. Id. at 929. And the fact that an expert's opinion on an ultimate factual issue supports the conclusion that a defendant is guilty does not make the testimony an improper opinion on guilt. City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

Applying the Kirkman test, the admissibility of Hutson's testimony was a closer call than that of Dr. Porterfield because of the difference in the nature of their expertise and personal involvement in the case. With the exception of a single statement by Hutson, however, we conclude admitting the expert testimony fell within the trial court's discretion.

First, Hutson was an expert on international standards relating to torture. He had no personal involvement in the case itself. Generally, experts are not permitted to offer opinions of law in the guise of expert testimony. Tortes v. King County, 119 Wn. App. 1, 12, 84 P.3d 252 (2003). But Hutson explained how the international standards prohibiting torture developed historically. He also identified specific acts—both physical and psychological—that have been condemned by the international community. This testimony was relevant to Larry's "lawful discipline" defense. Instruction 27 told the jury that it was a defense to assault of a child to use lawful force and that "[t]he physical discipline of a child is lawful when it is reasonable and moderate, and is inflicted by a parent for purposes of restraining or correcting the child." Although one can argue that the international standards set out in the Geneva Conventions constitute statements of international law, they are more than that. The standards represent a global recognition that certain conduct in the use of force against humans—whether adults or children— is neither reasonable nor moderate.

Dr. Porterfield is a clinical psychologist who personally evaluated I.W. Her expertise as a medical provider and her direct involvement in assessing how I.W.'s treatment affected him put her in a position to determine if I.W. had suffered "pain

or agony" equivalent to that typically seen in torture victims. Her expertise was just as relevant as Hutson's was, but for different reasons.

Second, the focus of Hutson's testimony was the historical development of international standards for the prohibition on torture, where he explained "classic" methods of discipline or treatment deemed impermissible because of the pain, mental anguish, humiliation and loss of personal dignity the treatment caused and compared those classic methods of torture with the alleged treatment of I.W. As this court stated in Carri's direct appeal, this testimony was helpful to the jury to understand more subtle forms of torture. C. Williams, No. 71193-8, slip. op. at 19.

Hutson's testimony did cross the line in one instance. Hutson's last statement on direct examination was that, in his opinion, I.W. and Hana had been tortured while living in the Williams home. We conclude that this testimony was analogous to the impermissible opinion of guilt given by a forensic chemist and detective in Montgomery. In that case, a detective and forensic chemist testified that the two defendants possessed pseudoephedrine "with the intent" to manufacture methamphetamine, the charged crime. 163 Wn.2d at 588-89. The Supreme Court determined that the testimony of the defendant's intent was impermissible. Id.

The Supreme Court noted, however, that it would have been permissible to ask the witnesses if the evidence was "consistent" or "inconsistent" with an intent to manufacture methamphetamine, for the witness to respond in the affirmative, and then for the witness to explain why this consistency existed. Id. at 594, n.8. In the present case, had the State's last question and Hutson's answer been

couched in the "consistency rubric" as recommended in Montgomery, it would have been permissible. However, the testimony came out as Hutson's personal belief of Larry and Carri's guilt. We agree with Larry that this portion of Hutson's testimony was improper.

But, as in Montgomery, neither Carri's nor Larry's counsel objected to this specific question, despite the trial court's statement that it would need to assess Hutson's testimony on a question-by-question basis. Nor did defense counsel ask to strike Hutson's answer or ask for a curative instruction.

In contrast to Hutson's impermissible statement, Dr. Porterfield's testimony did not cross the line. She testified about the criteria that medical professionals use to make psychological assessments. At no point did Dr. Porterfield state that, in her opinion, Larry tortured his children. Instead, she stayed within the trial court's limitation of testifying that Larry's conduct was "consistent with torture," as that term is understood by medical professionals. Dr. Porterfield's testimony fell squarely in the Montgomery rubric.

Third, Larry's defenses to the child assault charge were a general denial and the statutory defense of reasonable parental discipline set out in RCW 9A.16.100.[18] Larry's focus at trial was on the lack of evidence of any "substantial bodily harm" under RCW 9A.36.120.[19] He argued there was no evidence that I.W.

---

[18] Instruction 27 provided that it was a defense to the child assault charge that any force used was "lawful." The jury was instructed that to be lawful, the physical discipline must be "reasonable and moderate, and is inflicted by a parent for purposes of restraining or correcting the child."

[19] Instruction 22 defined "substantial bodily harm" as "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part. The State argued

had sustained a "substantial disfigurement," or "substantial loss or impairment" of any bodily part, or "fracture of any bodily part." Larry also challenged I.W.'s credibility, calling him a "self-professed liar," and argued that he was "highly suggestible," remembering events that simply did not occur. Larry contended that he never hit I.W. on the head causing him to bleed. And Larry argued that I.W.'s scars preexisted his immigration to the United States. Neither Hutson's nor Dr. Porterfield's testimony undermined Larry's contention that he did not cause substantial bodily harm to I.W. The jury remained free to accept Larry's or I.W.'s version of events as to the severity of Larry's physical discipline.

Finally, as to the other evidence before the jury, Larry did not deny engaging in most of the conduct Hutson and Dr. Porterfield focused on in their testimony. Several of Larry's children witnessed the events on which Hutson's and Dr. Porterfield's opinions were based. Although Larry argued that "torture" does not include mental anguish, we disagree. There was nothing in Hutson's or Dr. Porterfield's testimony that conflicted with state law.[20]

Under the Kirkman factors, we conclude that the trial court did not abuse its discretion in allowing Hutson's and Dr. Porterfield's testimony. Even though one of Hutson's statements was impermissible, we do not deem it to be reversible error.

---

that Larry hit I.W., causing scars, and hit I.W. on the bottom of his feet so hard that he could not move, both of which constituted substantial bodily harm.

[20] Larry asks this court to follow the Pennsylvania Supreme Court's reasoning in Commonwealth v. Crawley, 526 A.2d 334 (Pa. 1987), where the Pennsylvania Supreme Court reversed a conviction for aggravated murder after the jury was erroneously instructed on the definition of the term "torture." The State alleged that Crawley had committed the murder "by means of torture," and it called an expert to define the term "torture." Id. at 562. But that case is distinguishable because the expert not only explicitly defined the term "torture," he did so in a manner inconsistent with Pennsylvania law. Here, there was no conflict between the expert testimony and Washington law.

Important to the determination of whether opinion testimony prejudices a defendant is whether the jury was properly instructed. Montgomery, 163 Wn.2d at 595. In Kirkman, our Supreme Court concluded there was no prejudice in large part because, despite the improper opinion testimony on witness credibility, the jury was properly instructed that jurors were the sole judges of the credibility of witnesses and that jurors are not bound by expert witness opinions. 159 Wn.2d at 937. It also found such instructions sufficient to eliminate any prejudice in Montgomery, 163 Wn.2d at 596.

In this case, the jurors were similarly instructed that they were the sole judge of the credibility of any witness, and that they could accept or reject any opinion testimony from expert witnesses. During the testimony of Dr. Porterfield, Dr. Julia Petersen, and Dr. Wiester, the trial court instructed the jury that it could not consider any expert's recounting of events as true or accept as true that the events the experts described actually occurred. Although the trial court did not give this limiting instruction during Hutson's testimony, the jury was repeatedly instructed during trial and in the written instructions that it was to weigh the credibility and opinions of experts on its own. Jurors are presumed to follow these instructions. Kirkman, 159 Wn.2d at 937. We find no actual prejudice from this single, isolated statement by Hutson.

(c) The Lack of "Torture" Definitional Instructions

Larry next argues that that the trial court violated article IV, section 16 of the Washington Constitution because it did not provide an instruction defining the word

"torture" for the jury and invited the experts to do so. We reject this claim because it is unsupported by the record and case law.

Article IV, section 16 provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." Generally, an expert may not express an opinion on the meaning of a legal term when the definition of that term is in dispute. State v. Haq, 166 Wn. App. 221, 269, 268 P.3d 997 (2012). And an expert's incorrect statement of the law, particularly one critical to a defense, may warrant the reversal of a conviction. State v. Clausing, 147 Wn.2d 620, 629, 56 P.3d 550 (2002).

Here, the trial court did not "invite" either Hutson or Dr. Porterfield to define the word "torture" under Washington law. In fact, when Dr. Porterfield was asked to define "torture," defense counsel objected because the trial court had previously ruled that Hutson could not define the term for the jury:

> [W]e would object to Dr. Porterfield providing an actual definition of torture because, first of all, . . . she indicated that this wasn't based on Washington law. So we believe that it's improper for a witness to give an opinion as to what the law says.

> So she could state that in her clinical opinion, certain things constitute torture. But for her to actually give a definition of what torture is . . . invad[es] the province of the Court in instructing the jury as to what the law is.

> *And when John Hutson testified a couple of weeks ago, he was not allowed to actually give an outright definition, and I believe it was for that basis. He was allowed to talk about what things constituted torture, and a little bit about the history of international law on torture, but not to give actual definitions.* So we would ask that the ruling be consistent between these two experts.

(Emphasis added). The trial court permitted Dr. Porterfield to testify about the criteria she considered in deciding whether to admit someone into her treatment

program, to discuss whether those criteria are generally accepted in the international medical and psychological community, and whether the actions she reviewed and observed in the Williams children met these criteria. The trial court sustained the defense objection and prohibited Dr. Porterfield from defining torture "because it's going to be confusing to the jury how many definitions are out there and who's using what."

Additionally, neither Carri nor Larry requested a jury instruction defining torture. And neither took exception to the lack of any such definitional instruction. CrR 6.15(c) requires counsel to make a timely and well-stated objection to instructions given or refused in order that a trial court may have the opportunity to correct any error. State v. Scott, 110 Wn.2d 682, 686, 757 P.2d 492 (1988). No error can be predicated on a failure of the trial court to give an instruction when no request for such an instruction was ever made. Id.

Although article IV, section 16 requires the court to declare the applicable law, Larry cites no authority for the proposition that there is a constitutional requirement to define a term used in an instruction. Although due process requires the trial court to inform the jury of all elements of the crime, Scott, 110 Wn.2d at 690; State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997), the "failure to give a definitional instruction is not failure to instruct on an essential element." Scott, 110 Wn.2d at 690 (quoting State v. Tarango, 105 N.M. 592, 599, 734 P.2d 1275 (Ct. App. 1987)). As our Supreme Court said in Scott, "we find nothing in the constitution . . . requiring that the meanings of particular terms used in an instruction be specifically defined." Id. at 691. Because the issue is not one of

constitutional magnitude, we will reverse a conviction only if we find a fundamental defect resulting in a complete miscarriage of justice. Larry has not made such a showing here. For these reasons, we deny Larry's Claims 2, 4, and 5.

Claim 3: Testimony About I.W.'s PTSD

Larry next claims that the trial court abused its discretion when it admitted expert testimony that I.W. suffered from PTSD, arguing that this testimony was an impermissible opinion of his guilt. We reject this claim as well.

Larry moved to exclude evidence of I.W.'s PTSD as irrelevant. The trial court denied the motion, reasoning that the testimony had "a tendency to make the existence of facts regarding what went on in the Williams' household more likely." In this collateral attack, Larry argues that testimony that I.W. experienced traumatic events while living with the Williamses was essentially testimony that Larry had assaulted I.W.

The testimony came from Dr. Petersen, a psychiatrist at Seattle Children's Hospital, who started treating I.W. in 2011, and from Dr. Porterfield. Dr. Petersen testified when she first met with I.W., she took a history from him, conducted a mental status exam, developed a diagnosis, and then made recommendations for therapy based on the trauma he had expressed in her first session. Dr. Petersen recounted that I.W. told her that he felt scared, fearful, and confused. He did not want to return to his adoptive home and wanted some explanation for why his adoptive parents "hurt me physically," and caused Hana to experience "pain physically." I.W. described experiencing nightmares, becoming obstinate and oppositional, and having tantrums. He expressed worry at making mistakes, and

the fear of being punished for speaking out or sharing experiences he had had in his adopted home.

I.W. also reported being physically harmed. He was able to identify who in the family harmed him and what exactly they did to him. He told Dr. Petersen that Larry and Carri both hit him with a rod on his feet and that Larry struck him with a belt. When Dr. Petersen asked about Hana, I.W. became tearful and said he was scared to tell her "any secrets." I.W. described Hana as his protector who spoke out for him. He knew Hana was experiencing harm in the home.

Based on her assessment of I.W., Dr. Petersen diagnosed PTSD, a condition that arises out of trauma that impacts a person's daily functioning, social abilities, thinking, and emotional regulation. She based her diagnosis on criteria set out in the DSM-IV.[21] One of the DSM-IV criteria is having been exposed to a traumatic event. Dr. Petersen testified that I.W. shared that he had witnessed traumatic events, of Hana being hurt, and of feeling helpless and not being able to save or protect her. Other traumatic events I.W. disclosed involved the fear he developed from being physically harmed and the helplessness he felt because he could not escape.

Dr. Petersen described the symptoms I.W. developed, including recurrent thoughts, nightmares, bed wetting, the fear of talking about feelings and of interacting with his foster family, an inability to recall important details of the

---

[21] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR (4th rev. ed. 2000).

trauma, social withdrawal, difficultly sleeping, hypervigilance, and a high level of anxiety.

Dr. Porterfield testified that she too diagnosed I.W. with PTSD and depression based on information collected from I.W. and his two therapists. Like Dr. Petersen, she testified that I.W. reported having flashbacks, an inability to sleep, irritability, self-blaming thoughts, and a fear of death and of being harmed by the Williamses. She testified that her examination found that the content of I.W.'s fears and anxieties stemmed from his experiences in the Williams home.

Larry contends that because one of the diagnostic criteria for PTSD is exposure to a traumatic event, Dr. Petersen's and Dr. Porterfield's diagnosis implicated Larry in the charged crime of assault. He relies on Black, in which our Supreme Court held that the trial court abused its discretion in admitting testimony from a rape counselor that the victim had been diagnosed with "rape trauma syndrome," evidence on which the State relied to prove that the defendant had raped the victim. 109 Wn.2d at 338.

The issue in Black, however, was whether the presence of certain symptoms was a scientifically reliable method of proving rape. Carlton v. Vancouver Care, LLC, 155 Wn. App. 151, 163, 231 P.3d 1241 (2010). The holding in Black rested on the conclusion that under Frye,[22] a diagnosis of rape trauma syndrome was not generally established as a scientifically reliable means of proving that a rape had occurred. 109 Wn.2d at 348. Larry does not challenge Dr. Petersen's or Dr. Porterfield's testimony under Frye. Unlike in Black, the State

---

[22] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

did not offer testimony from Dr. Porterfield and Dr. Petersen to establish that Larry had assaulted I.W. In fact, the trial court explicitly instructed the jury that it could not rely on the testimony of these experts to conclude that the assault had occurred.

The Court in Black said "[w]e do not imply, of course, that evidence of emotional or psychological trauma suffered by a complainant after an alleged rape is inadmissible in a rape prosecution." Id. at 349. It is now generally accepted that mental disorders, and specifically PTSD, are beyond the ordinary understanding of laypersons. State v. Green, 182 Wn. App. 133, 146, 328 P.3d 988 (2014). In State v. Ciskie, 110 Wn.2d 263, 280, 751 P.2d 1165 (1988), for example, the Supreme Court held that admitting testimony from a psychological expert that an alleged rape victim had been diagnosed with PTSD was not an impermissible comment on the credibility of the victim where the trial court limited the expert's testimony to the fact of the diagnosis without allowing the expert to indicate her assessment of the victim's credibility.

Similarly, in State v. Florczak, this court concluded that the trial court did not err when it admitted an expert's testimony that the child victim of alleged molestation suffered from PTSD. 76 Wn. App. 55, 74, 882 P.2d 199 (1994). The court found error only because that same expert testified the child's PTSD was "secondary . . . to sexual abuse." Id. By stating her diagnosis was "secondary to

sexual abuse," the court concluded the expert had rendered an opinion of ultimate fact that the child had in fact been sexually abused. Id.[23]

Here, this case is analogous to Ciskie and distinguishable from Florcsak. Unlike Florczak, neither expert expressed an opinion that Larry assaulted I.W. The providers merely recounted statements I.W. made to them. But their diagnoses were not based solely on their assessment of I.W.'s credibility. They interviewed others involved in I.W.'s life, such as I.W.'s foster family, teachers, social workers, and other medical providers. Dr. Petersen observed I.W. in his classroom. Dr. Porterfield reviewed police reports; viewed photographs of Hana, I.W. and the other members of the Williams family; read the autopsy and toxicology report on Hana; read handwritten notes between the Williams children; and reviewed medical records, adoption agency records, transcripts of interviews with the Williamses children, and testimony from a shelter care hearing after the Williams children were removed from their parents' home. Under these circumstances, the trial court did not abuse its discretion in admitting expert testimony that I.W. had been diagnosed with PTSD. For these reasons, we deny Larry's Claim 3.

### Claim 6: Testimony Relating to the Book, "To Train Up a Child"

Larry next contends that the trial court erroneously admitted testimony related to a "controversial" parenting book, To Train Up a Child,[24] a book law enforcement officers seized from the Williams home. Although Larry argues this

---

[23] We note that the court in Florczak did not reverse the defendant's conviction, concluding that the error was harmless because the untainted evidence was so overwhelming as to necessarily support the guilty verdict. 76 Wn. App. at 75.

[24] MICHAEL & DEBI PEARL, TO TRAIN UP A CHILD (1994).

evidence infringed on his First Amendment rights, he cites to no cases in which a court treated this type of evidentiary challenge as an error of constitutional magnitude. Although on direct appeal we review a trial court's evidentiary rulings for abuse of discretion, In re Pers. Restraint of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009), on collateral review, we must determine if the petitioner has established a fundamental defect resulting in a complete miscarriage of justice, Pirtle, 136 Wn.2d at 489.

We conclude no such defect occurred here. During trial, the State marked the book as Exhibit 436 but did not offer it into evidence. One of Larry's sons testified that he was familiar with this book and that his mother had indicated the book guided her discipline techniques. When Carri took the stand, she testified that she had read the book and that she had pulled ideas from the book for disciplining her children, including using a plumbing line to spank her children and using a garden hose to "rinse off" children as a part of their potty training. Carri admitted that the family had the quote "to train up a child" on a sign affixed to the wall in their home. Carri further admitted that the book informs readers that spanking should cause pain. Jacob, who was recruited by his parents to discipline the other children, testified that punishment should involve the infliction of pain. Larry also testified he wanted to inflict pain or discomfort when spanking the children.

The evidence was probative of whether the physical discipline Larry and Carri chose was "reasonable and moderate" and "inflicted by a parent . . . for purposes of restraining or correcting" the children, the defense Larry raised under

RCW 9A.16.100. A reasonable jury could conclude that the book recommended methods of discipline that Larry and Carri incorporated into their daily parenting practice and that the purpose of a chosen disciplinary practice was to cause pain and fear in the child being punished, rather than to correct misbehavior. The fact that they chose disciplinary procedures laid out in that book, told the children that they were following the book as a guide, and had the title of the book taped on a poster on the wall of their home, made it highly probable that they were following the book's recommended practices for a purpose other than to restrain or correct their children.

Nor was the limited testimony about the book's contents prejudicial. Larry cites to State v. Coe, 101 Wn.2d 772, 684 P.2d 668 (1984), and to State v. Hanson, 46 Wn. App. 656, 731 P.2d 1140 (1987), to support his claim that the book was more prejudicial than probative. But those cases are distinguishable because they both involved the admission of the defendant's own writings as character evidence to show a propensity for committing the charged crimes. In this case, neither Larry nor Carri authored To Train Up a Child. The State was not offering the evidence to establish their propensity to commit child abuse. Instead, it sought to establish that Larry and Carri intentionally chose punishments intended to inflict pain and humiliation on Hana and I.W., not to correct misbehavior.[25]

---

[25] Larry also relies on State v. Waters, 627 F.3d 345 (9th Cir. 2010). But Waters is inapplicable. There, the defendant was charged with arson after setting fire to buildings on the University of Washington campus to protest genetic engineering. Id. at 348. The Ninth Circuit concluded that the district court erroneously admitted "anarchist literature" because the district court failed to read the literature in advance to determine whether it was more prejudicial than probative. Id. at 357. Here, the trial court did not admit the book into evidence.

Finally, Larry argues that the book was "known to be controversial," but he cites nothing in the record to support this proposition. Nor is there any indication in the record that any of the jurors were familiar with the book, its authors, or any controversy surrounding its contents. Because the trial court did not admit the book into evidence, and the jury's exposure to its teachings was limited to the testimony elicited from Carri and from their third eldest son, Larry has failed to establish that admitting testimony about Carri's or Larry's use of, or reliance on, recommendations contained in To Train Up a Child constituted a fundamental defect amounting to a miscarriage of justice. We deny Larry's Claim 6.

<u>Claims 7 & 8: Ineffective Assistance of Counsel</u>

Finally, Larry asserts that his counsel, both at trial and on appeal, was deficient in violation of his Sixth Amendment right to counsel. First, he claims that his trial counsel's failure to request severance of the counts relating to Hana from the count relating to I.W. was deficient. Second, he argues that his trial counsel's failure to object to the testimony about To Train Up a Child was deficient. Finally, he contends that his appellate counsel was deficient for failing to raise on direct appeal many of the issues raised in this personal restraint petition.

A criminal defendant has a right to effective assistance of counsel at trial and on his first appeal of right. Strickland v. Washington, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). A claim of ineffective assistance of counsel presents a mixed question of law and fact. In re Pers. Restraint of Fleming, 142

Wn.2d 853, 865, 16 P.3d 610 (2001). Because of that, this court reviews claims of ineffective assistance de novo.

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must demonstrate that counsel's performance was deficient and that this deficient performance prejudiced the defense. Id. The first prong requires a showing that counsel's representation fell below an objective standard of reasonableness based on consideration of all the circumstances. Id. at 865-66. The second prong requires the defendant to show there is a "reasonable probability" that, but for counsel's errors, the results of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. (quoting Strickland, 466 U.S. at 694).

To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate the merit of the legal issues appellate counsel either raised inadequately or failed to raise at all, and to show how he was prejudiced by this deficient performance. In re Pers. Restraint of Netherton, 177 Wn.2d 798, 801, 306 P.3d 918 (2013). Failure to raise all possible non-frivolous issues on appeal is not ineffective assistance of appellate counsel, and the exercise of independent judgment in deciding what issues may lead to success is the heart of the appellate attorney's role. Dalluge, 152 Wn.2d at 787.

(a) Trial Counsel's Failure to Move for a Severance

Larry first asserts that his trial counsel's failure to request severance of the counts related to Hana from the count related to I.W. constituted deficient performance. One of Larry's trial attorneys, Rachel Forde, submitted a declaration

that she did not file a motion to sever because it simply did not occur to her to do so. Even if we assume that trial counsel's failure to file this motion as "inadequate trial preparation, inadequate factual investigation or inadequate legal research," as Larry argues, we must still determine if such a motion would likely have been granted and, if so, whether there is a reasonable probability that the outcome of the trial (or trials as the case may be) would have been different.

Under CrR 4.3(a), joining offenses in one trial is allowed where the charged offenses "'(1) [a]re of the same or similar character, even if not part of a single scheme or plan; or (2) [a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.'" State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017).

When determining whether to sever charges, a trial court must consider "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." State v. Sutherby, 165 Wn.2d 870, 884-85, 204 P.3d 916 (2009) (quoting State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)). In addition, any residual prejudice must be weighed against the need for judicial economy. Russell, 125 Wn.2d at 63.

Larry relies on Sutherby to support his argument that the trial court would have granted a severance. 165 Wn.2d at 885. But that case is too factually distinguishable from this case to lead to such a conclusion. In that case, Sutherby was charged with first degree rape and first degree molestation involving the same

child, and multiple counts of possession of child pornography. Id. at 874. The Supreme Court held that Sutherby's trial counsel was deficient in failing to move to sever the child rape/molestation charges from the pornography charges. It deemed the State's evidence of the pornography charges to be strong but the evidence of the molestation charges to be weak because the State was relying exclusively on the testimony of the six-year-old victim. Id. at 885. It further found the fact that the State consistently argued that Sutherby's possession of child pornography proved that he molested the child to be prejudicial. Id. at 885.

The charges in Sutherby clearly did not meet the CrR 4.3(a) test of being of "the same or similar character" or "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." Unlike Sutherby, Larry's charges of homicide by abuse, manslaughter, and child assault were the same or similar and were based on a series of acts constituting parts of a single scheme or plan. In the charge of homicide by abuse, the State had to prove a pattern or practice of assault or torture of Hana. In the charge of child assault, the State had to prove a pattern or practice of assaulting I.W. or causing him pain or agony that was equivalent to that produced by torture. The Williams children testified that Larry and Carri disciplined both Hana and I.W. in the same manner for the same perceived rule infractions. These children and I.W. were key witnesses and would have been called to testify about the conduct the State contended constituted this pattern or practice toward both children. Sutherby is simply not analogous to this case.

- 47 -

Under the first severance factor, the trial court would have evaluated the State's evidence against Larry on the Hana-related charges and the I.W.-related charge. Multiple counts may be severed if one case is remarkably stronger than the other. State v. MacDonald, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004). Unlike in Sutherby, we do not see a significant or remarkable disparity in the strength of the evidence. The charge relating to I.W. was not based solely on his testimony. The State had physical evidence of mistreatment, including photographic evidence of his scars, to corroborate I.W.'s testimony. And several of the Williams children corroborated I.W.'s version of events.

Moreover, courts are concerned that joining multiple charges in the same trial may invite a jury to cumulate evidence to find guilt or to infer a criminal disposition. Russell, 125 Wn.2d at 62-63. Here, the jury could not reach unanimity on the homicide by abuse charge against Larry. This fact demonstrates that the jury was not influenced by the evidence on the child assault charge in its assessment of the charges relating to Hana's death.

The second factor, the clarity of defenses, requires a review of whether Larry's defenses to each count were prejudiced by joinder. Russell, 125 Wn.2d at 63. A defendant may be prejudiced by joinder if it affects his ability to make his defenses clear to the jury. State v. Cotten, 75 Wn. App. 669, 687, 879 P.2d 971 (1994). If the jury was capable of understanding a defendant's various defenses, then this factor supports joinder. State v. Craven, 69 Wn. App. 581, 587, 849 P.2d 681 (1993). Mutually antagonistic defenses may also form the basis for severance if a defendant can prove prejudice. State v. Grisby, 97 Wn.2d 493, 508, 647 P.2d

6 (1982). The existence of mutually antagonistic defenses is not alone sufficient to compel separate trials. State v. Hoffman, 116 Wn.2d 51, 74, 804 P.2d 577 (1991). A defendant must prove that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that a defendant is guilty of both charges. Id.

Larry's defenses relating to each child were not the same. As to the homicide charges, Larry argued he was not present, was unaware of Carri's actions, and should not be held responsible for Carri's conduct outside of his presence. As to the assault charge, Larry argued his discipline did not cause I.W. to suffer substantial bodily harm. These defenses were clear and capable of being understood by the jury. While Larry contends these defenses conflict with each other, we see no irreconcilable inconsistency between them. He could credibly challenge I.W.'s recollection of events due to his history of fabricating stories, his young age, and his suggestibility without undermining Larry's testimony that he had no idea what Carri was doing to Hana on the night of her death.

But even if Larry's defenses were "mutually antagonistic," that fact alone will not support a motion for severance "unless the defendant demonstrates prejudice." State v. Watkins, 53 Wn. App. 264, 270, 766 P.2d 484 (1989). Prejudice may arise if a defendant "makes a convincing showing that [he] has important testimony to give concerning one count and a strong need to refrain from testifying about another." Id. But Larry does not argue that had the counts been severed, he would have testified at the trial of the child assault charge but exercised his right to remain

silent in the trial on the homicide charges. We simply do not see the prejudice that Larry contends is so "obvious."

Third, the jury was instructed to consider each count separately. A jury is presumed to follow these instructions. State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995). The fact that Larry was not convicted of homicide by abuse is strong evidence that the jury understood and followed this instruction.

Finally, we consider whether the evidence would have been cross admissible even if the charges were not joined for trial. Joinder is not generally deemed prejudicial when evidence of one crime is admissible to prove the elements of another. State v. Weddel, 29 Wn. App. 461, 465, 629 P.2d 912 (1981). Although not addressed by Larry, had the assault count been severed from the homicide by abuse and manslaughter counts, the evidence that Larry had assaulted I.W. would likely have been admissible in the homicide trial under ER 404(b) as evidence of a common scheme or plan. In conjunction with the manslaughter charge, the State alleged a domestic violence aggravator, contending that the offense involved domestic violence that was a part of "an ongoing pattern of psychological [and] physical . . . abuse of a victim or multiple victims." I.W.'s testimony of the abuse he suffered was critical to this aggravator, which the jury found present for both Larry and Carri. The cross admissibility of the evidence weighs in favor of joinder and against any finding of prejudice.

We also feel compelled to point out that this trial lasted seven weeks, and involved 53 lay and expert witnesses, many of whom came from out-of-state to testify. The court had to coordinate American Sign Language interpreters for I.W.,

for his therapist, Dr. Petersen, and for several other hearing impaired witnesses. If this complexity were insufficient to deny severance, a trial court would have considered that two trials would have required I.W. and the Williams children to testify not once, but twice—always a factor to consider when evaluating whether any prejudice to a defendant is outweighed by the need for judicial economy.

All the factors weigh against severance. Thus, we cannot conclude that had defense counsel moved to sever the charges, the trial court would have granted that motion. We thus reject Larry's claim for ineffective assistance of trial counsel in failing to request a severance of charges.

(b) Trial Counsel's Failure to Object to Testimony About "To Train Up a Child"

Larry next contends that his trial counsel's failure to object to the testimony related to To Train Up a Child was deficient because the book was known to be controversial. This claim lacks merit. To prevail on this claim, Larry must demonstrate that his trial counsel's failure to object to testimony about the book was unreasonable, without any legitimate trial strategy or tactic. Matter of Lui, 188 Wn.2d 525, 559, 397 P.3d 90 (2017). A decision not to object to evidence falls within the wide range of professional norms. In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

Given that the State was not offering the book into evidence, that Larry elicited testimony from Carri that the book did not in fact recommend that spankings should cause pain, and that Larry was never asked about this book, it is conceivable that defense counsel did not object because they were reticent to draw more attention to it. In light of our determination that there was no error in

allowing witnesses to be questioned about the book, Larry has not demonstrated that his trial counsel was deficient in failing to object to it.

### (c) Appellate Counsel's Failure to Raise the Issues in this Petition

Finally, Larry contends that his appellate counsel should have raised the claims raised in his personal restraint petition.[26] Because we have rejected each of these claims, Larry's ineffective assistance claim on appeal lacks merit. We therefore reject Larry's Claims 7 and 8.

## CONCLUSION

Based on our review of Larry's personal restraint petition and the trial record, we conclude there were no constitutional errors giving rise to any actual prejudice and no fundamental defects resulting in a complete miscarriage of justice. Larry received a fair trial. We thus deny his personal restraint petition.

WE CONCUR:

---

[26] Larry alleged four errors in his direct appeal: (1) that there was insufficient evidence to support a manslaughter conviction; (2) that Larry's trial counsel was deficient in failing to request a proximate cause instruction for the manslaughter conviction; (3) that the trial court erroneously refused to instruct the jury on intervening and superseding causes; and (4) that Larry's exceptional sentence was erroneous. L. Williams, No. 71112-1-I, slip op. at 7, 12, 14, 17. This court disagreed with all of Larry's claims and affirmed his convictions and sentence. Id. at 20.